---

(5 Misc. Rep. 575.)

### In re WOODS.

(Supreme Court, Special Term, Niagara County. November, 1893.)

1. ELECTION—MANDAMUS TO CANVASSING BOARD.
    Laws 1892, c. 680, § 133, empowering the supreme court to compel, by mandamus, any county board of canvassers to correct errors in any statement or determination made by it, does not authorize the court to consider questions which the board itself had no power to consider, and to compel action by the board based on its decision of such questions.

2. SAME—BOARD OF CANVASSERS—POWERS.
    A county board of canvassers cannot reject any votes which may come to it duly certified, on the ground that the statute which authorized such votes to be cast is unconstitutional.

Application by Robert G. Woods for a writ of mandamus to compel the county board of canvassers of the county of Niagara to correct certain errors in relation to the election of school commissioners in the second district of said county. Denied.

Richard Crowley and A. K. Potter, for petitioner, Woods.
D. L. Brong, for respondents Board of County Canvassers.
Mr. Ransom, for C. N. Hoffman.

WARD, J. This is a proceeding for a mandamus under section 133, c. 680, Laws 1892, which, among other things, provides as follows:

"The supreme court may, upon affidavit presented by any voter, showing that errors have occurred in any statement or determination made by any

county board of canvassers, make an order requiring such board to correct such errors, or show cause why such correction should not be made. If such board fail or neglect to make such correction, or to show cause as aforesaid, the court may compel such board by writ of mandamus to correct such errors."

At the recent election held on the 7th of November, among the offices to be filled thereat was that of school commissioner for the second school commissioner district in the county of Niagara. The principal candidates before the people, and who had been duly nominated, were the petitioner, Woods, who had been nominated by the Republicans; Charles N. Hoffman, who had been nominated by the Democrats; and Ruth A. Frost, who had also received a nomination for that office. That there were voted in said school commissioner district, at said election, for the office of school commissioner, for the petitioner, 1,425 votes; for Hoffman, 1,444 votes; and a less number for the lady candidate. That, included in and forming a part of the 1,425 votes so voted for the petitioner for said office, there were 39 ballots that had been cast by females, of the kind and description specified in section 2, c. 214, Laws 1892, each indorsed "school commissioner." That, included in and forming a part of the said 1,444 votes so cast for the said Hoffman for said office, there were 79 ballots that had been voted by females under the said act, each indorsed "school commissioner." That the inspectors of the several election districts in the said school commissioner district duly canvassed the vote cast at their respective districts, made proclamation thereof as required by statute, and certified their returns as required by statute. These returns came duly before the respondents, the canvassing board of Niagara county, and the returns embraced the 118 votes cast by females as aforesaid. The canvassing board of the county, in the discharge of its duties, proceeded to make the canvass of the school commissioner district as required by law. The petitioner, Woods, appeared before them, and protested against their counting or allowing the votes cast by the females, upon the ground that they were invalid. The board disregarded his protest, and counted their votes, the same as other votes, and made a statement and determination of the election for school commissioner of the second district of all the votes cast for commissioner in that district, and such statement declared that, of said votes, 1,425 were voted for the petitioner, Woods, 1,444 for the said Hoffman, and 635 for Ruth A. Frost, with some scattering votes, which do not affect the question here, and they also certified and determined that the said Hoffman was duly elected school commissioner for the said district. It is apparent that had the said female votes been excluded, as the petitioner desired, he would have had a small majority over Mr. Hoffman, and would have been entitled to a declaration of election in his favor. His contention now is that the law under which the females were permitted to vote was unconstitutional, and therefore void; that the votes thus counted, that had been given by the females, were not votes; that it was demonstrated to the board of canvassers by the returns made by the local inspectors just how

many such votes there were, and for whom given, and therefore they had the absolute proof that the female votes were cast by persons not qualified to vote, and that they should not have counted them or included them in their canvass and determination of such vote; and that the court, on this motion, should correct this error, and direct the board to reassemble, and issue a new certificate declaring the petitioner elected.

The reason given why such votes were void is that the statute referred to was unconstitutional and void, and the counsel for the petitioner boldly state that it was the duty of the canvassing board to have so declared, and passed upon the constitutionality of this statute. This is a new question. While numerous authorities were presented to the court, covering almost every other question, none were produced affirming the principle that the canvassing board, being merely an administrative body, could exercise the high judicial function—the highest, perhaps, known to our jurisprudence —of determining the constitutionality of a statute of a state. By chapter 214 of the Laws of 1892, entitled "An act to determine those who have a right to vote for school commissioners," it is provided by section 1:

"All persons, without regard to sex, who are eligible to the office of school commissioner, and have the other qualifications now required by law, shall have the right to vote for school commissioners in the various commissioner districts of the state."

The second section provided for the registration of such voters, and the third section referred to the duties of inspectors, and the separate ballot box, etc.

By chapter 9 of the Laws of 1880, it is provided that:

"No person shall be deemed ineligible to serve as any school officer, or to vote at any school meeting, by reason of sex, who has the other qualifications now required by law."

The first question I will consider is, what is the power of the court in this summary proceeding, under the statute of 1892, above given? The statute provides that the court shall correct the errors of the board of county canvassers. Can the court go further than to place itself in the position of the board, as a ministerial body, without judicial powers, and say what it would have done in the place of said board, or had the right to do? One of the learned counsel for the petitioner insisted that if the court reached the conclusion that the board erred upon the legal question as to whether the ballots cast by the women were valid, the court could direct the reconvening of the board, and the certificate to the petitioner, for the reason that the act was unconstitutional, while the board itself might not have the power to pass upon the constitutional question. This is a dangerous doctrine. There is no usurpation so great as judicial usurpation; and the doctrine once permitted that the judge may substitute his judgment and will in the place of the canvassing board, and direct them to do what they had not themselves the power to do, we cannot tell where the mischief will end, in the tremendous contests and excitements

growing out of the elections in this country. I think the judge can only correct such errors as the board itself made.

This leads to the inquiry as to the power of the board to pass upon the constitutionality of this statute. When was it ever heard or claimed, before, that a mere ministerial body, composed, not of lawyers, not of judges, but of supervisors of towns, and citizens not learned in the law, could assume to decide, as aforesaid, one of the gravest questions that could come before a court of justice? The courts have spoken upon this question in no uncertain terms, and have held that a ministerial officer cannot refuse to perform a duty enjoined upon him by a statute on the ground that the statute is unconstitutional. People v. Stevens, 2 Abb. Pr. (N. S.) 348; Smyth v. Titcomb, 31 Me. 272, 285; Merrill, Mand. § 66; People v. Salomon 51 Ill. 39; Bassett v. Barbin, 11 La. Ann. 672. The court, placing itself in the position of this board, must hold that the board could not raise this objection. It is no answer for a ministerial board to make, in refusing to perform a statutory duty, that the statute is unconstitutional, unless it has been so declared by the court of last resort in the state, or at least by an appellate court, after full consideration. Assuming for the moment that an election board could pass upon the constitutionality of a statute, where would the mischief end? Into what countless labyrinths and perplexities would it lead us? These boards are not free from public excitement or political prejudice. In close elections the temptation would be very strong to make a constitutional objection a pretext for almost any wrong, and thus the security of the means by which our elections are declared and certified would be seriously impaired, if not overthrown. The statute as to counting and certifying the votes of electors for the various offices is very plain and concise. The local inspectors must count the votes they receive, and certify them. The county canvassing boards must, upon those returns, declare the result. They have power to have corrected clerical errors made by the local boards, or send for complete returns, under the statute, but the power is nowhere given in the statute for the canvassing board to reject any vote that comes to it certified in due form by the local inspectors as having been cast at the election. If any other system prevailed, endless controversies would arise before these ministerial boards, which would impede the celerity with which those returns should be brought in and determined, and in many instances make the elections a farce or a fraud; and the courts have, with great unanimity, sustained the proposition that these ministerial boards must simply follow the statute directing their action, and not assuming in any manner judicial functions in the discharge of their duties. But assuming, for a moment, that the court will award a mandamus, where a statute is unconstitutional, to prevent obedience to it, there must be a clear case. There must be no doubt of its unconstitutionality.

The question of the constitutionality of this law is not free from difficulty, and, in view of the importance of the questions involved, it may not be unprofitable to glance for a moment at this question, without attempting to decide it. The counsel for the petitioner

present upon this argument the opinion of Mr. Justice Williams "in the matter of the cancellation on the registry list of the names of certain women" who were registered in the counties of Onondaga and Oneida, and claimed the right to vote for school commissioners. 26 N. Y. Supp. 167.　The learned judge, in a short opinion, reaches the conclusion that the act of 1893, authorizing women to vote, is unconstitutional; and it is said that several other judges of this court have reached a similar conclusion, and that conclusion seems based upon the definition of an "elector" in section 1, art. 2, of the constitution, as "every male citizen," etc., and the provision of section 2, art. 10, of the constitution, which is as follows:

"All county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct.　All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose.　All other officers, whose election or appointment is not provided for by this constitution, and all officers, whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct."

It being conceded that the office of school commissioner was created by the legislature after these constitutional provisions had gone into effect, it is assumed that it comes within the scope of the last portion of section 2, art. 10, just quoted:　"All officers that are now or hereafter may be elected by the people."　There is no doubt but what the school commissioner is an officer, and that he holds an office under the laws of this state, nor is there any doubt but what all the boards of education and trustees of schools, and other school officers that are elected by the people at elections, are officers; and, if the position of the learned judge proves that the school commissioner is within this prohibition of article 10, it goes much further, and affects all other school officers that have been elected at popular elections at which women have voted.　The board of education, therefore, of the city of Lockport, which is elected by the voters of the city, women participating, and who appoint the trustees of the various school districts, and whose duties are simply that of school officers, are not legally elected, if such election was contributed to by women.　Is it a fact that the great educational interests of this state, especially the common school or free school system of the state,—the most important of all systems, the system by which our people are educated,—is utterly ignored by the constitution, except in a single paragraph, to be found in section 1, art. 9, which is as follows:　"The capital of the common school fund, the capital of the literature fund, and the capital of the United States deposit fund, shall be respectively preserved inviolate.　The revenue of the said common school fund shall be applied to the support of common schools; the revenue of the said literature fund shall be applied to the support of academies, and the sum of twenty-five thousand dollars of the revenues of the United States deposit fund shall each year be appropriated to and made part of the capital of

the said common school fund,"—and is a recognition of an existing school system which the statutes have provided? Why this significant omission? The constitution makers evidently designed that the whole common school system should be left untrammeled, both as to its scope and existence, as to the creation of its officers, and as to the methods of educating the people, leaving it to the legislature, as "the legislative power is absolute and unlimited, except as restrained by the constitution." Bank v. Brown, 26 N. Y. 467; People v. Flagg, 46 N. Y. 401. It may be argued that the constitution no more intended to cripple the legislature in providing the instruments to carry on the education of the people, to wit, its officers, than it had as to its means of raising money for that purpose, or providing the general machinery by which the people were to be educated. Therefore, it is said that the officers mentioned to be thereafter elected, as provided by section 2, art. 10, of the constitution, has no reference to school officers, but only to such officers as are created for the political relations and divisions of the state, and in regard to the subjects which the constitution, in and of itself, takes away from the legislature, or takes control of in the limited manner indicated by the constitution itself. A school officer in a city like Rochester, with 150,000 people, elected by the people, in which the women participate, is quite as important an officer as a school commissioner in a rural district with half the population of that city, and yet no question has been made but what women had the right to participate in the election of the city and village officers for school purposes. The duties of the school commissioner are as strictly confined to the school system and to educational purposes as that of any other school officer, and are a part of the system created by the legislature for the management of the schools. The supreme court of Michigan, in the case of Belles v. Burr, reported in 76 Mich. 1, 43 N. W. 24, in a case where a married woman brought an action for damages against the election board in the city of Flint, Mich., for refusing to receive her vote at an election for school trustees in the city of Flint, held, although the constitution of that state provided that at every election every male citizen thereof should be entitled to vote, and there was no provision authorizing females to vote, that she was a legal voter, and she should have recovered damages; and they put it upon the ground that the same constitution provided that the legislature should provide for and establish a system of primary schools, whereby a school should be kept without charge for tuition, etc., and that a school should be maintained in each school district at least three months in the year, etc., and that the statute having provided for a general common school system, and the election of school officers under that provision of the constitution, the school officers which they provided for were not the kind of officers for which male electors could exclusively vote, although in that clause of their constitution, as in ours, the right of suffrage was confined to male citizens. Now, the only difference between that condition and ours is that our constitution, instead of providing that the legislature should provide a school system, has, by its omission to touch the subject at all,

further than above stated, left the legislature free to act upon that subject. Therefore, this Michigan case is an authority for the position which was taken by the respondents in this proceeding,—that the women were entitled to vote for school commissioner. The same position, with a similar constitution as that of Michigan, has been taken by the supreme court of Illinois in Plummer v. Yost, decided January 19, 1893, and reported in 33 N. E. at page 191. A proceeding by action in which all the parties are interested can be brought, and the right to this office be tested, and these questions fully and deliberately disposed of, in the proper place to determine this matter. The court will not in this summary proceeding do so. The proceedings which elicited the opinion of Judge Williams and others that this statute was unconstitutional were preventive, and taken to strike from the registry the names of the women that had become registered, and claimed the right to vote. The very fact that these preventive proceedings were taken (in the face of the certainty that these female votes could be traced, not only to those who gave them, but the persons for whom they were given by the canvassing boards) may be a concession that, after the votes get into the ballot box, they must be treated like other votes by the ministerial boards. What these learned judges would have said upon the state of facts here presented, as to whether a writ of mandamus should issue, is not at all to be determined from their opinions as to the constitutionality of this law. The application for a writ of mandamus to the canvassing board must be denied, and the proceedings of the petitioner dismissed, but without costs, as the questions are new, and an order may be prepared and entered accordingly.